IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JESSE SOLOMON                             *

          Plaintiff            *

          vs.                  *   CIVIL ACTION NO. MJG-14-3570

THE BERT BELL/PETE ROZELLE NFL   *
PLAYER RETIREMENT PLAN and THE
NFL PLAYER SUPPLEMENTAL           *
DISABILITY PLAN
                                  *
          Defendants
*       *       *       *       *       *       *       *       *

MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

    The Court has before it Plaintiff's Motion for Summary

Judgment [ECF No. 23], Defendants' Motion for Judgment on the

Administrative Record [ECF No. 27], and the materials submitted

relating thereto.  The Court has held a hearing and had the

benefit of the arguments of counsel.

    As discussed herein, Plaintiff Jesse Solomon ("Solomon")

has sued Defendants the Bert Bell/Pete Rozelle NFL Player

Retirement Plan and the NFL Player Supplemental Disability Plan

(collectively referred to as "the Plan") for payment of certain

disability benefits.

I.   BACKGROUND

A.   Jesse Solomon

Upon his graduation from Florida State University in 1986 with a Bachelor's degree in Political Science, Solomon played linebacker in the National Football League ("NFL") for the Minnesota Vikings until 1989.   In 1989, he was traded to the Dallas Cowboys and played for that team until 1991.   In 1991, he was traded to the New England Patriots and then immediately re-traded to the Tampa Bay Buccaneers, for whom he played in 1991-92.   He was released by the Buccaneers in 1992 and played for the Atlanta Falcons from 1992 until 1994.   In 1994, he signed with the Miami Dolphins as a free agent and retired from professional football at the end of the 1994/95 season.

Over the course of his nine-season NFL career, it is estimated that Solomon sustained approximately 69,000 "full-speed contact hits."   AR[1] 437.   "Too many times to count," he experienced "triple vision" after an impact and would, at times, "lose sense of who [he was]."   AR 616.   Additionally, he sustained numerous injuries to his knees and underwent multiple knee operations to repair ligaments, tendons, and scar tissue. AR 357.

---

[1]   All citations herein to "AR" refer to the Administrative Record filed under seal by the Plan [ECF No. 28].

2

Following his NFL career, Solomon completed a Master's degree program at Florida A&M University, obtained a Florida teaching and coaching certificate, and worked, starting in 2001, as a high school football coach and physical education instructor.  But, as time passed, he suffered increasingly from chronic headaches, joint problems, depression, and anxiety.

In 2005, an MRI of Solomon's brain revealed abnormalities that his physician, Dr. Hudson, opined were "most likely a result of multiple high velocity impacts in a helmet-to-helmet fashion and chronic concussion syndrome."  AR 358.  In that same report, Dr. Hudson noted that he suffered from a wide variety of injuries "that are likely to worsen with time and are seemingly the result of the violent conditions he experienced during his career."  AR 359.  In 2007, Solomon was forced to resign from his high school teaching and coaching job because of changing behaviors, namely that he kept "losing his cool."  AR 616.  He has been unemployed ever since.

On October 29, 2008, an Occupational Therapist, Brian Matuszak, opined that Solomon was totally and permanently disabled ("TPD"), noting:

> Mr. Solomon is not able to perform even
> SEDENTARY level of work secondary to his
> inability to sit greater than 10 mins. at
> one time without change in positioning,
> stand for greater than 2-3 mins. at one time
> and walk for greater than 10-15 mins. at one

3

> time, poor concentration requiring frequent
> redirection secondary to his focus on pain
> which inhibits vocational productivity, poor
> overall endurance inhibiting ability to
> maintain basic positional tolerances and
> sustain concentration to perform sedentary
> tasks over a full workday.

AR 435.


    B.   <u>The Plan</u>

The Plan provides disability benefits to, among others not here relevant, retired players like Solomon who become TPD as a result of their football career and are thus unable to work ("T&P benefits").  The level of benefits paid varies depending upon when the player's disability manifested.  <u>I.e.</u>:

- "Football Degenerative" benefits[2] are paid for disabilities stemming from a player's football career that manifest within 15 years of retirement;

<u>See</u> Plan Section 5.1(c), AR 023.

- Lesser "Inactive" benefits are paid for disabilities not stemming from a player's football career, or if stemming from a player's football career, that did not manifest within 15 years of retirement.

<u>See</u> Plan Section 5.1(d), AR 023-24.

---

[2]   The amount of these benefits as of the date of the Board determination at issue is different from the amount at present. However it is clear that, at all times, Football Degenerative benefits were greater than Inactive benefits.

Because Solomon retired at the end of the 1994/95 season, in order to be eligible for Football Degenerative benefits, his disability must have manifested by March 31, 2010.

C.   Administrative Procedures

The Plan provides a review process for consideration of applications for disability benefits from current and former NFL players.  Applications are initially considered by a two-person Disability Initial Claims Committee ("the Committee"). An applicant can appeal from an adverse Committee decision to the six member[3] Retirement Board ("the Board").

On March 11, 2009, Solomon, not represented by an attorney, applied to the Disability Initial Claims Committee ("the First Application") for T&P benefits under the Plan, claiming that he was TPD based on a variety of orthopedic impairments.  AR 468-73.  On May 14, 2009, the Committee denied the First Application.  AR 497.

On July 13, 2009, Solomon filed an application with the Social Security Administration ("SSA") for Social Security

---

[3] Three appointed by the NFL and three by the NFL Players Association.

disability benefits.  Pl.'s Mem. [ECF No. 23-1] at 16.  This application was later[4] supplemented or superseded.

On August 3, 2009, while his SSA application was pending, Solomon appealed the Committee's denial of his T&P benefits application ("the First Appeal") to the Board.  AR 513.  On November 19, 2009, the Board denied the First Appeal.  AR 541.

On December 12, 2010, Solomon filed a second, different application ("the Second Application") with the Committee, seeking T&P benefits under the Plan related to neurological and cognitive impairments resulting from countless helmet-to-helmet impacts sustained during his NFL career.  AR 564-68.  The Committee was deadlocked as to whether Solomon was TPD, and his application was deemed denied on March 9, 2011.  AR 655.  On April 27, 2011, Solomon appealed the denial of the Second Application to the Board ("the Second Appeal").  AR 672.

On June 21, 2011, while the Second Appeal was pending, an SSA Administrative Law Judge issued a Notice of granting Solomon disability benefits and stating:

> I found you disabled as of October 29, 2008 because your impairment or combination of impairments is so severe that you cannot perform any work existing in significant numbers in the national economy.

---

[4]  On December 20, 2010.

AR 680.  Solomon was awarded SSA benefits retroactive to April 2009[5] and began receiving regular monthly disability benefit payments of $2,063.00 effective August 2011.  AR 686-92.

On August 4, 2011, the Board designated Solomon TPD, awarding benefits effective October 1, 2010.[6]  AR 702-05. Because the Board determined that Solomon had not become TPD within 15 years of this retirement (i.e., by March 31, 2010), he was awarded Inactive level benefits.  Id.  The Board, however, notified Solomon that he had a right to appeal to the Board for reconsideration of his level of benefits.

On September 27, 2011, Solomon appealed to the Board seeking reclassification of benefits to the Football Degenerative category and contending that he became TPD before the March 31, 2010 cutoff date for Football Degenerative benefits ("the Third Appeal").  AR 707.  On November 16, 2011, the Board rejected the Third Appeal, stating that the record did

---

[5]  The SSA Notice of Decision stated, "you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits."  AR 686.  Thus, because Solomon was found TPD as of the end of October 2008, his benefits did not begin until April 2009.  He received retroactive benefits from that date through June 2011, minus an amount subtracted by the SSA for payment of his representative (AR 687), and an amount for July 2011.  Regular monthly payments began effective August 2011.

[6]  In most cases, the Board awards retroactive benefits beginning on the first day of the month that is two months before the application was filed.  Because Solomon's Second Application was filed in December 2010, the first day of the month two months previous was October 1, 2010.

not support a finding that he had become TPD prior to the cutoff
date.  AR 719-21.  A November 23, 2011 letter informing Solomon
of the Board's denial of the Third Appeal stated that the denial
was a "final decision on review within the meaning of section
503 of the Employee Retirement Income Security Act of 1974"
("ERISA") and that, to challenge the decision, Solomon could
file suit under ERISA § 502(a).  AR 720-21.


    D.  <u>Judicial Procedural Posture</u>

    On November 14, 2014, Solomon filed the instant lawsuit for
denial of benefits, pursuant to ERISA § 502(a)(1)(B), 29 U.S.C.
§ 1132,[7] in response to the Board's November 2011 final denial of
Football Degenerative benefits.

    The parties have filed cross-motions for summary judgment
and agree that there are no genuine issues of material fact with
regard to Solomon's claim of entitlement to Football
Degenerative benefits.  Hence, summary judgment is appropriate
in regard to that claim.[8]

---

[7]  "A civil action may be brought by a participant or beneficiary
. . . to recover benefits due to him under the terms of the
plan, to enforce his rights under the terms of the plan, or to
clarify his rights to future benefits under the terms of the
plan."  29 U.S.C. § 1132(a)(1)(B).

[8]  A motion for summary judgment shall be granted if the
pleadings and supporting documents "show[] that there is no
genuine dispute as to any material fact and the movant is

## II.   DISCUSSION

### A.   Level of Benefits

As stated above, the Plan provides benefits to retired players who become TPD as a result of their NFL career. "Football Degenerative" benefits are paid in regard to such disabilities that manifest within 15 years of retirement. Lesser "Inactive" benefits are paid in regard to such disabilities that manifest more than fifteen years after retirement.

The parties agree that Solomon's total and permanent disability stemmed from his football career.  See Defs.' Opp. and Reply [ECF No. 33] at 1 ("When the Retirement Board denied Solomon's request for Football Degenerative benefits, it never questioned his diagnosis or whether his impairments were caused by League football activities.").  However, they disagree as to whether his disability had manifested within fifteen years of his retirement, i.e., by March 31, 2010.

Solomon contends that the Board wrongly denied him Football Degenerative benefits because:

- The Board was required to accept the Social Security Administration determination that he became TPD as of October 29, 2008, and

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

- The Board abused its discretion in failing to find that he was TPD by March 31, 2010.

The Court shall address these contentions in turn.


1.   The Social Security Determination

As stated above, while the Second Appeal was pending, the Social Security Administration issued a Notice of Decision, finding Solomon TPD as of October 29, 2008 and awarding monthly disability benefits of $2,063.00 retroactive to April 2009. Solomon contends that, by virtue of the Social Security determination, the Board was bound to award him the Football Degenerative benefits he sought.

At the time of the Board decision at issue, Section 5.2(b) of the Plan stated:

> Social Security Awards.  Effective April 1, 2007, a Player who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled . . . .[9]

AR 025.

---

[9]   Subject to an exception not here relevant regarding fraudulent receipt of Social Security benefits.

The Plan concedes that, by virtue of this provision, it was bound by the SSA determination that Solomon was TPD but argues it was not bound to accept the SSA determination of the <u>date</u> on which he became TPD.  As the Plan stated regarding denial of the Third Appeal, "the Retirement Board noted your argument that the Social Security Administration set the effective date of your disability benefits at October 29, 2008.  The Retirement Board found that such effective date decisions are not binding on the Plan, and that the issue of classification is based on all the facts and circumstances."  AR 720.

The Plan takes the position that, despite the SSA decision's statement that Solomon was TPD as of October 29, 2008, it was not required by Section 5.2(b) to accept the onset date determined by the SSA.  The Plan contends that it is bound only as of the date that the SSA decision is presented to the Board.  The Court finds the Plan's position regarding the meaning of Section 5.2(b) erroneous.

Section 5.2(b), as in effect until 2014, does not expressly state the date as of which an SSA disability award binds the Plan.  The Court finds, contrary to the Plan position, that the most reasonable – perhaps the only reasonable – interpretation is that the SSA determination is binding as to the findings made by the SSA.  That is, that the player was TPD

on the date as of which SSA awards benefits.  The SSA does not determine the level of Plan benefits because the SSA's award is not dependent upon a finding that the disability stemmed from the player's NFL career.

This interpretation is supported by the Plan's 2014 amendment.  As noted by the Plan, Section 5.2(b) was amended in 2014 "so that it now explicitly states that 'determinations by the Social Security Administration as to the timing . . . of total and permanent disability are not binding' on the Retirement Board when making classification decisions."  See Defs.' Mem. [ECF No. 27-1] at 20-21.  Such a change is generally viewed as indicating a change of meaning.  See, e.g., DIRECTV, Inc. v. Brown, 371 F.3d 814, 817 (11th Cir. 2004).  Even if the amendment is viewed as clearing up an ambiguity in the plan prior to amendment, the ambiguity should be construed against the drafter.  As stated by the United States Court of Appeals for the Fourth Circuit in Glocker v. W.R. Grace & Co., 974 F.2d 540 (4th Cir. 1992), pertaining to an ERISA plan:

> Alleged ambiguities should be reconciled, if possible, by giving language its ordinary meaning and, if necessary, by admitting relevant, extrinsic evidence.  If ambiguities remain, the Plan should be construed against the drafter, in this case [the employer] . . . .

Id. at 544.

The Plan suggests that an unpublished district court decision, Bryant v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, Civ. No. 1:12-cv-936-MHC (N.D. Ga. March 23, 2015) [ECF No. 27-2], supports its position.  This Court would – if presented with the facts of the Bryant case, reach the same bottom line conclusion but not for the reason proposed by the Plan.  The Bryant decision did not turn upon the issue critical to Solomon, that is, whether an SSA determination of the disability onset date was binding on the Plan under Section 5.2 of the Plan as it existed prior to the 2014 amendment. Nevertheless, even if Bryant is read as stating an opinion (not necessary to the decision) that the SSA date was not binding on the Plan, this Court would respectfully disagree.

In the instant case, the parties agree that Solomon became TPD stemming from his NFL career and disagree only as to the onset date.  In Bryant, there was agreement that the player had become TPD but disagreement as to both the onset date and whether the disability stemmed from the player's football career.

On December 1, 2008, Bryant applied for T&P benefits, and the application was denied promptly because Bryant was then employed.  Bryant did not file a timely appeal to the Board.  He

did, however, thereafter apply to the SSA for disability benefits.

Sometime prior to June 10, 2010, the SSA granted Bryant social security disability benefits with a finding of disability as of December 1, 2009 and granted benefits to begin in May 2010.  Bryant appealed, in SSA proceedings, the determination of the date of onset of his disability.  In his SSA appeal, Bryant contended that he was TPD as of June 1, 2008 rather than December 1, 2009.

On June 10, 2010, while his SSA appeal was pending, Bryant reapplied to the Plan for T&P benefits.  On July 8, 2010, the Committee awarded Bryant Inactive T&P benefits based on the SSA's December 1, 2009 disability onset date, relying upon Section 5.2(b).  The Committee denied Football Degenerative benefits because it found that the onset of his disability was more than 15 years after the end of Bryant's football career, i.e., after March 31, 2009.[10]  The Committee did not determine whether Bryant's disability stemmed from his football career.

On February 24, 2011, an SSA Administrative Law Judge ruled for Bryant with regard to his SSA appeal, determining that his disability onset date was June 1, 2008.

---

[10] Fifteen years after his retirement.

14

On or about April 20, 2011, Bryant petitioned the Committee to reclassify his benefits as Football Degenerative, based upon Section 5.5(b) of the Plan.  That section permits reclassification of benefits if a player shows the Committee by clear and convincing evidence "that, <u>because of changed circumstances</u>, the Player satisfies the conditions of eligibility for a benefit under a different category of total and permanent disability benefits."  <u>Bryant</u> [ECF No. 27-2] at 12 (emphasis in original).

Bryant contended that the SSA change of his disability onset date constituted "changed circumstances" under Section 5.5 and that it was "clear from the Administrative Law Judge's decision that [his] totally and permanently disabling impairments are football related."  <u>Id.</u> at 5.

The Committee denied Bryant's petition on or around June 10, 2011.  Bryant then appealed to the Board.  As stated by the <u>Bryant</u> court:

> The Board denied the appeal at its August 4,
> 2011 meeting (AR 223-26), reiterating that
> "the fact of a new Social Security date does
> not constitute a 'changed circumstance'
> within the meaning of the Plan." (AR 225.)
> The Board stated that it "has interpreted
> the term 'changed circumstances' to mean a
> change in the Player's physical condition,
> such as a new or different disability."
> (<u>Id.</u>) The Board then opined that, even if
> changed circumstances were "hypothetically
> present," the evidence was not "clear and

>convincing" because the SSA's findings were
>not binding on the Board and the Board did
>not have the records that were available to
>the ALJ. (<u>Id.</u>) There is nothing in the
>Board's decision that indicated whether
>Bryant's disability arises out of NFL
>football activities.

<u>Id.</u> at 6-7.

Bryant filed suit in the Northern District of Georgia on or
about March 20, 2012.  He contended that the SSA's determination
of a June 1, 2008 disability onset date constituted a "changed
circumstance" and that it was clear that his disability was
football related.

The <u>Bryant</u> court held that "the Plan's interpretation of
the term 'changed circumstances' as meaning a change in physical
condition is within the authority of the Plan and reasonable."
<u>Id</u>. at 14-15.  Therefore, regardless of the onset date change,
Bryant had not established entitlement to Football Degenerative
benefits.

Bryant's attempt to rely upon Section 5.2(b) of the plan
was also rejected.  The <u>Bryant</u> court stated:

>. . . Section 5.2(b) of the Plan does one
>thing and one thing only – it deems any
>Player who receives a disability
>determination made by the SSA to be totally
>and permanently disabled under the Plan.
>That entitles the Player to T&P disability
>benefits, but does not determine the
>category of those benefits.  The subsequent
>decision of the SSA to change the date for
>the onset of Bryant's disability did not

> result in the automatic awarding of Football
> Degenerative T&P benefits under Section
> 5.2(b). Consequently, this Court concludes
> that the Board's decision that the SSA's
> determination of the date of disability does
> not obligate the Plan to award a certain
> category of T&P disability benefits is not
> wrong.

Id. at 15-16.

The Bryant court was not faced with a situation in which (as in the instant case) the onset date of disability was determinative of the level of benefits. Hence, the Bryant decision did not turn on the onset date as a substantive matter. Rather, Bryant turned on the procedural question whether a changed onset date would constitute "changed circumstances" under Section 5.5. It would not. Bryant did not establish by clear and convincing evidence that there had been a change in his physical condition from that considered previously, such as a new or different disability, that would satisfy the conditions of eligibility for Football Degenerative level benefits.

The Court agrees with the Bryant court that "[t]he subsequent decision of the SSA to change the date for the onset of Bryant's disability did not result in the automatic awarding of Football Degenerative T&P benefits under Section 5.2(b)." Id. at 16. That is because the SSA finding changing the date of onset of disability to be within 15 years of retirement did not

address, much less determine, whether Bryant's disability stemmed from his football career.

The bottom line is that the Court finds that Section 5.2(b) of the Plan, as it existed at times pertinent to the instant case, provided that the Plan was bound by the fact, and onset date, of disability found by the SSA when it made its disability award to Solomon.  Inasmuch as the parties agree that Solomon's disability stemmed from his NFL career, he is entitled to Football Degenerative benefits.


### 2.   The Board's Abuse of Discretion

As discussed herein, if the SSA determination of the onset date of Solomon's disability were not given conclusive effect, the Court would find that the Board abused its discretion in denying Solomon Football Degenerative benefits.


### a.   Standard of Review

"When a plan administrator's denial of benefits was based on an exercise of discretion . . . judicial review of the denial of benefits is for abuse of discretion." Switzer v. Benefits Admin. Comm., No. MJG-13-1613, 2014 WL 4052855, at *7 (D. Md. Aug. 13, 2014).  Section 8.9 of the Plan, pertaining to "deciding claims for benefits," states:

> In deciding claims for benefits under this
> Plan, the Retirement Board and Disability
> Initial Claims Committee will consider all
> information in the Player's administrative
> record, and shall have full and absolute
> discretion to determine the relative weight
> to give to such information.

AR 039. Therefore, the abuse of discretion standard applies and the Board's denial of Solomon's Third Appeal will be set aside "only if it is not reasonable." Switzer, 2014 WL 4052855, at *7. In determining whether a plan administrator abused its discretion, a court may not "re-weigh the evidence itself" or "substitute its own judgment in place of the judgment of the plan administrator." Id.

"The administrator's decision is reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Duperry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011) (quoting Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995)). "Substantial evidence" is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Switzer, 2014 WL 4052855, at *7 (citation omitted).

Courts in this circuit consider, inter alia, eight factors in reviewing a plan administrator's decision for reasonableness: (1) the language of the plan, (2) the purposes and goals of the

plan, (3) the adequacy of the materials considered to make the decision and the degree to which they support it, (4) whether the Retirement Board's interpretation was consistent with other provisions in the Plan and with earlier interpretations thereof, (5) whether the decision-making process was reasoned and principled, (6) whether the decision was consistent with the procedural and substantive requirements of ERISA, (7) any external standard relevant to the exercise of discretion, and (8) the Retirement Board's motives and any conflict of interest it may have.  Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).

It is well settled that "it is not an abuse of discretion for a plan fiduciary to deny . . . benefits where conflicting medical reports were presented."  Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999);  see also Switzer, 2014 WL 4052855, at *9.  Indeed, it is the responsibility of the plan administrator, not the Court, to resolve conflicting medical assessments.  Spry v. Eaton Corp. Long Term Disability Plan, 326 F. App'x 674, 679 (4th Cir. 2009);  Webster v. Black & Decker (U.S.) Inc., 33 F. App'x 69, 75 (4th Cir. 2002).  However, while administrators do not bear the "discrete burden of explanation when they credit reliable evidence that conflicts" with a claimant's evidence, they cannot "arbitrarily refuse to credit a

claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).


### b.   The Board's Decision

### i.   The Evidence

The Court finds that the Board's determination, that Solomon was not TPD as of March 31, 2010 based on his cognitive impairments, was not "the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995).  The evidence supporting Solomon's position was overwhelming and not opposed by any substantial evidence supporting the Board's decision.

For example, the evidence in the record includes:

- The December 15, 2005 MRI of Solomon's brain showing "white matter changes in the deep white matter of both parietal lobes", AR 346;

- The February 15, 2006 letter from Dr. Hudson noting "chronic headaches" and stating the white matter changes observed in the 2005 MRI "are most likely a result of multiple high velocity impacts in a helmet-to-helmet fashion and chronic concussion syndrome," AR 358;

- Solomon's resignation from his coaching job in November 2007 related to "escalating" thoughts and behaviors stemming from his cognitive impairments, AR 766;

- Solomon's unemployment since resigning from his coaching job in November 2007, AR 616;

- The June 10, 2008 letter from Dr. Hudson noting "progressive numbness" in Solomon's hands and feet related to the changes in Solomon's brain observed in the 2005 MRI, AR 371;

- The October 29, 2008 Functional Capacity Evaluation finding Solomon TPD and noting, inter alia, his inability to "sustain concentration to perform sedentary tasks over a full workday," AR 435;

- The June 11, 2009 letter from Dr. Hudson noting that Solomon will require treatment from a "variety of medical specialists" and will never "obtain[] or sustain[] meaningful employment," AR 500;

- The June 11, 2010 MRI of Solomon's brain and resulting report by Dr. Stallworth finding diffuse axonal injury, a devastating traumatic brain injury, AR 780;

- The August 23, 2010 evaluation by Dr. Fernandez noting complaint of worsening cognition over a 5-10 year period, including "decreased attention, poor concentration, slurred speech, decreased recall, and increased irritability," AR 781;

- The February 17, 2011 evaluation by Plan physician, Dr. DiDio, noting Solomon's worsening cognition over 5-10 years, AR 615; and

- The April 11, 2011 letter from Dr. Hudson noting Solomon's "severe cognitive impairments" and saying "it has been my contention for the recent past" that Solomon was TPD, AR 667.

Perhaps the most significant unrefuted evidence is the confirmation of the pre-March 31, 2010 cognitive disability by the June 2010 diagnosis of diffuse axonal injury.  There is no evidence to support the notion that this condition manifested

less than three months prior to the diagnosis.  Moreover, in
February 2011, the Plan's own neurologist noted that Solomon had
suffered from worsening cognition over 5-10 years, not that his
condition had suddenly deteriorated in the 11 months since March
31, 2010.

### ii.  The Res Judicata Contention

The Plan presents a res judicata theory, stating that, in
reaching its decision regarding the TPD onset date:

> [T]he Retirement Board had already
> determined (in conjunction with a previous
> application for T&P benefits [the First
> Application]) that Solomon was not totally
> and permanently disabled as late as November
> 19, 2009. Solomon never challenged that
> prior decision, and absent a challenge the
> Retirement Board treated that prior decision
> as res judicata, as it must to prevent a
> Player from repeatedly disputing an
> otherwise final benefits decision.  Second,
> the record contains next to nothing
> concerning Solomon's disability status
> between November 19, 2009 and March 31,
> 2010, and what little there is does not
> prove that Solomon became totally and
> permanently disabled prior to the Football
> Degenerative cut-off.

Defs.' Mem. [ECF No. 27-1] at 3.

The Court finds the Plan's position untenable at least[11] by
virtue of § 5.2(d) of the Plan, which states:

---

[11]  The Court is not herein addressing Solomon's additional
arguments regarding the Plan's res judicata contentions.

> A Player whose claim for benefits . . . has been denied and is not subject to further administrative review will be presumed conclusively to be not totally and permanently disabled under the provisions of Section 5.2(a) for twelve months following the date of such final denial.  . . .  This Section 5.2(d) does not apply to an application that first informs the Plan of an award of disability benefits under the Social Security disability Insurance program or Supplemental Security Income program to that Player.

AR 025-26.

Of course, Solomon could not have informed the Plan of the June 21, 2011 award to him of SSA benefits in the course of the First Application that resulted in the November 19, 2009 rejection.  Solomon first informed the Plan of the SSA award in the course of the Second Application.  Hence, the "res judicata" effect of § 5.2(d) is inapplicable with regard to the Second Application.


B.   Remand

Ordinarily, a court finding improperly denied benefits would remand the case for further proceedings before the plan administrator.  Gorski v. ITT Long Term Disability Plan for Salaried Employees, 314 F. App'x 540, 548 (4th Cir. 2008) ("[I]t is generally the case that when a plan administrator's decision is overturned, a remand for a new determination is

appropriate.").   However, when a plan administrator abuses its discretion, the Court may award benefits to the claimant rather than remand the case.   Helton v. AT&T Inc., 709 F.3d 343, 360 (4th Cir. 2013) (affirming district court's award of summary judgment and retroactive benefits to plaintiff, noting that "remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion"); Gorski, 314 F. App'x at 549 (reinstatement of benefits was the appropriate remedy when plan administrator's termination of those benefits was an abuse of discretion).

In the instant case, neither side seeks remand.   The Court shall, therefore, determine that Solomon is entitled to Football Degenerative benefits.


C.   Retroactive Benefits

Solomon's Second Application, seeking Football Degenerative benefits, was filed on December 12, 2010.   The Board rejected the claim for Football Degenerative benefits but awarded Inactive benefits.   The Plan, pursuant to its usual practice,[12] awarded these benefits retroactively to October 1, 2010.

---

[12]   The Plan generally awards TPD benefits retroactive to the first day of the month beginning two months prior to the application's filing date.   Plan § 5.6(a), AR 028 ("For a written application for total and permanent disability benefits . . . that resulted in the award of the total and permanent

The Plan provides that, if "an application was delayed because of the Player's mental incapacity," up to 36 months of benefits may be retroactively awarded.  Plan § 5.6(a), AR 028. Solomon contends that his filing the Second Application was delayed more than three years by virtue of his mental incapacity.  However, because of the existence of genuine issues of material fact regarding this contention, the matter cannot be resolved on cross motions for summary judgment

D.   Prejudgment Interest

Solomon states, in the conclusion of his memorandum in support of his Motion for summary judgment, ECF No. 31 at 35, that he wishes to receive prejudgment interest.  Neither party has addressed the matter in their briefing or at the hearing on the instant motions.  Therefore, the issue shall not be resolved by the instant decision.

disability benefits that is received on or after April 1, 2008, total and permanent disability benefits will be paid retroactive to the first day of the month that is two months prior to the date such application . . . is received.").

III. <u>CONCLUSION</u>

For the foregoing reasons:

  1.    Plaintiff's Motion for Summary Judgment [ECF No. 23]
        is GRANTED in part.

  2.    Plaintiff shall be awarded Football Degenerative
        benefits.

  3.    Defendants' Motion for Judgment on the
        Administrative Record [ECF No. 27] is DENIED.

  4.    By April 8, 2016, Plaintiff shall arrange a
        telephone conference to identify those matters that
        require resolution prior to the entry of final
        judgment and such further proceedings as may be
        necessary.


SO ORDERED, this <u>Friday, March 04, 2016</u>.


                    _____/s/_____
                    Marvin J. Garbis
                United States District Judge